G4s2narA

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   NARL REFINING LIMITED
     PARTNERSHIP,
 4
                    Plaintiff,              New York, N.Y.
 5
             v.                             16 Civ. 404(RA)
 6
     BP PRODUCTS NORTH AMERICA,
 7   INC.,

 8                  Defendant.

 9   ------------------------------x

10                                         April 28, 2016
                                           2:35 p.m.
11
     Before:
12
                         HON. RONNIE ABRAMS,
13
                                           District Judge
14

15                          APPEARANCES

16

17
     QUINN EMANUEL URQUHART & SULLIVAN, LLP
18        Attorneys for Plaintiff
     BY:  PHILIPPE Z. SELENDY
19        MARIA GINZBURG
          DANIEL P. MACH
20

21   HERBERT SMITH FREEHILLS NEW YORK, LLP
          Attorneys for Defendant
22   BY:  SCOTT S. BALBER
          DAVID W. LEIMBACH
23        CHRISTIAN LEATHLEY

24

25
```

G4s2narA

1          (Case called; all parties present)

2          THE COURT:  Good afternoon.

3          We are here on NR's motion for preliminary injunction

4   to enjoin the defendant's performance under the Crude and

5   Additional Products Purchase and Sale Agreement, which I will

6   refer to as the Crude PSA.

7          I just want to confirm, do you have a plan to call any

8   witnesses?  I have obviously reviewed your submissions, I have

9   reviewed all the declarations, but does anyone want to put on

10  any witnesses today?

11         MR. SELENDY:  No, your Honor.

12         MR. BALBER:  No, your Honor.

13         THE COURT:  All right.  So why don't I hear from

14  plaintiffs first.  I am going to really ask you to focus

15  primarily on the harm being imminent, so why don't we start

16  with that.

17         MR. SELENDY:  Yes.  Thank you, your Honor.

18         So what I would like to do, if I may, is set the

19  context, the factual context, for the refinery.

20         This is a massive industrial facility in Newfoundland.

21  It occupies approximately nine square city blocks in terms of

22  space.  It is filled with the typical units of a refinery --

23  the crude oil distillation unit, a platformer, hydrocracker

24  units, VIS breakers.  It is an extremely complex interaction of

25  pipes and valves and boilers, heat and pressure and flame and

G4s2narA

the like.  It operates continuously, seven days a week, 24
hours a day.

What's unusual about this refinery, and it is
particularly important here, is that it is not connected to any
crude pipelines or wells.  It is supplied solely by water.
Under the terms of the contract, the exclusive supplier of
crude oil to the refinery is British Petroleum.  There is a
need for approximately a million barrels of crude oil every ten
days to be delivered to the refinery or it will shut down.  In
practice, that means that every six days there is an Aframax
class tanker that has to be brought in from British Petroleum.
So the timing here is everything.  If the supply is not
constant, the refinery will have to shut down.  The fluid is
constantly being cycled through and refined.  It has to be
delivered by British Petroleum, the exclusive supplier, and BP
is also the primary purchaser of the refined products.

As I say, that makes for a situation in which you have
a unique dependency on BP to deliver the product.  It is partly
a function of the contract in which BP has the right and has
the obligation to deal solely in that structure, and it is
partly because BP has security liens on the plant, property,
and equipment.  Those security liens are encumbered most
notably by the contingent liabilities that were created when BP
broke off talks last year and rushed to assert the arbitration
claims, namely, $101 million of claims against the refinery.

G4s2narA

1    As you know, I believe, the refinery has counterclaimed for

2    approximately $160 million.

3           So right now we have a very tenuous situation in which

4    the relationship between these two parties has massively

5    deteriorated.  The great concern for the refinery is that if BP

6    suspends performance, even for two weeks, then that causes a

7    shutdown; and in the event of a shutdown, the safety factor is

8    dramatically affected.  It is set forth in Exhibit C to the

9    Amin declaration.  I think it is page 21.  But the risk factors

10   increase by 200 to 500 times the ordinary operation.  That's,

11   again, a function of the pressure, the heat, everything being

12   shut down and restarted.  There is a cost to the refinery of $1

13   million a day in terms of the shutdown.  There are

14   approximately 700 workers, and this is the second largest

15   employer in Newfoundland.  The Minister of Natural Resources

16   issued a public statement last month that the continued

17   operation of the refinery was important to the province, and

18   that's an instance of public good.

19          So as you assess whether or not a preliminary

20   injunction should issue, we submit that there are basically

21   three lines of Second Circuit authority that provide a very

22   clear direction in terms of how this should be done:

23          The first instance, what we are seeking is essentially

24   a status quo injunction.  We are not asking for anything more

25   than for BP to perform under the contract, and they say that

G4s2narA

1    they continue to perform --

2              THE COURT:  Are they not performing under the contract

3    now?

4              MR. SELENDY:  You know, that's a very interesting

5    issue because the entire premise of this dispute in arbitration

6    concerns the ways in which -- on the counterclaims, concerns

7    the ways in which BP has not performed and the allegations that

8    BP makes that the refinery has not performed.

9              Specifically, there are in excess I think of $100

10   million of claims that relate to BP's provision of unstable and

11   self-incompatible crude oils or crude oils that are bottom

12   heavy or LPG rich, all factors that relate to the productivity

13   of the refinery, the suitability of the crude that BP delivers,

14   and the like.  And there have been concerns, which escalated

15   right up until the point that we filed this action for

16   preliminary injunction, with respect to BP's reservations of

17   rights to suspend performance; its pretextual assertion of

18   *force majeure* clauses; the statement by one of its directors,

19   Paul Lantero, that BP would not take away the product, which is

20   just as damaging as not delivering, and the like.

21             What has happened over the last couple of months, now

22   that we are in the jurisdiction of this court and before the

23   arbitrators, is that we have seen some degree of improved

24   performance.  But the problem is this:  If BP changes its mind

25   and decides, again, to not only reserve its right to suspend

1  performance, but to act on that, to say that the 100 million of

2  claims it has against the refinery create a material breach

3  with a capital M, which they have not yet asserted, should they

4  do that, we have an extremely narrow window to try and seek

5  relief.

6          To spell this out a little bit more, the negotiations

7  to set up the arrangement with BP took close to a year.  If we

8  were to negotiate with an alternative supplier, it would take

9  somewhere between 90 days and 120 days, we believe, to set up

10  that arrangement.  But we can't even negotiate during the

11  pendency of the claims from the arbitration because the

12  security lien will sit first, before any alternative supplier,

13  making it practically impossible for us to get any other vendor

14  to come and sell oil to the refinery.

15          THE COURT:  Assuming for the moment all of that to be

16  true, and I think so far you have really gotten into how the

17  harm would be irreparable, right?

18          MR. SELENDY:  Correct.

19          THE COURT:  But what I want you to focus on first is

20  is it imminent?

21          MR. SELENDY:  This is the issue, your Honor.  What we

22  are seeking is either an injunction today to compel continued

23  performance under the contract, which, under the authorities

24  from the Second Circuit, including *Roso-Lino* and *Blumenthal*, to

25  be merely a status quo injunction; or, alternatively, that they

G4s2narA

1    give us 30 days' notice if they change their mind as to whether

2    they will perform, 30 days which would allow us to come back to

3    this court and to reopen proceedings in the event that we

4    believe that is an unjustified suspension.

5         THE COURT:  Aren't you just asking me, with respect to

6    the 30-day agreement, to rewrite the contract essentially?

7         MR. SELENDY:  No, I am not, your Honor.  Let's look at

8    the cases where the Second Circuit said that it is important

9    for the district court to enable an arbitration to take place.

10   I have cited to you just now *Roso-Lino* and *Blumenthal*.  In

11   *Blumenthal*, the court made plain that the Second Circuit has

12   given explicit and broad recognition to district courts of the

13   power to grant preliminary injunctions pending arbitration; and

14   the point that the Second Circuit made, both in *Roso-Lino* and

15   in *Blumenthal*, was that arbitration can become a hollow

16   formality if parties are able to alter irreversibly the status

17   quo before the arbitrators are able to render a decision in a

18   dispute.

19        THE COURT:  In *Roso-Lino*, notice was given that the

20   contract was to be terminated, right?

21        MR. SELENDY:  Correct.

22        THE COURT:  So is that distinguishable from --

23        MR. SELENDY:  No.  It really doesn't matter, because

24   the question is what will create irreparable harm?  In

25   *Roso-Lino*, the notice itself gave rise to the events that would

1    create irreparable harm.  Here, BP could create irreparable

2    harm without terminating, but simply by suspending, simply by

3    saying, We don't have crude available for you, or by exercising

4    their procedural leverage and delaying matters.

5         The problem that we have is that, given the

6    extraordinary power that BP has over the refinery, in a

7    context, frankly, that is more severe than any of the cases

8    that were cited, because this is not just a unique product or

9    an important product, but the only product that the refinery is

10   able to use, in that context, a suspension of performance

11   undoes the work of the refinery.

12        THE COURT:  Does not giving assurances constitute

13   irreparable harm?

14        MR. SELENDY:  Here is the problem.  Assurances under

15   the UCC or under the Second Circuit law have to be gauged by

16   the practical reality, the commercial reality.  If we have a

17   statement from BP that says, We continue to perform, that's not

18   sufficient for the refinery where they, at the same time,

19   refuse to stipulate to continued performance, even where the

20   refinery is willing to enter into the same stipulation or where

21   they refuse to stipulate to 30 days' advance notice.

22        I want to come back to your point where you ask, Isn't

23   that rewriting the contract?  What the Second Circuit said is

24   that there is no burden from a status quo injunction, because

25   all you are asking the parties to do is to perform under the

1    terms of the contract.  If we take the 30-day notice provision,

2    that's even more modest than a status quo injunction, because

3    there is no burden on BP at any point unless and until they

4    decide as a point of fact they need to abruptly terminate; and,

5    in that event, there is a 30-day injunction that says, no, you

6    keep performing during this notice period.  So it is a lesser

7    remedy than the status quo injunction that the Second Circuit

8    itself said was not burdensome to the defendant.

9         THE COURT:  Without something that was required for

10   your business to not be endangered in some fashion, why wasn't

11   it in the initial agreement?

12        MR. SELENDY:  The agreement was drafted for a

13   circumstance in which the parties were operating in good faith

14   and where there would be cure periods to correct problems that

15   could be noticed to each other.  It was not intended, with

16   respect to those notice times, to address the problem where one

17   side goes into an arbitration and asserts what we believe are

18   claims that are meritless on the face of the contract and

19   encumbers the refinery with a massive contingent liability

20   through the security liens.

21        I will note, in the contract, however, the refinery

22   specifically negotiated a savings clause.  That's in clause 22,

23   where we have an absolute right to come and seek this very form

24   of relief, preliminary injunctive relief, until the arbitration

25   proceeding is concluded.  The purpose of that is to follow the

1   guidance of *Blumenthal* and *Roso-Lino* and ensure that a district

2   court can oversee this and ensure that the dispute between the

3   parties is resolved on the merits.

4           THE COURT:  But I don't think there is a question as

5   to my jurisdiction to consider the motion, right?  It is just

6   the merits of the motion.

7           MR. SELENDY:  Well, that's correct.  You know, there

8   was an effort by BP to ask the arbitrators to, in turn, write

9   to you and say, no, we will take care of the proceedings and

10  the arbitrators rejected that motion, said, no, the refinery

11  has the right to come in front of you and seek this relief.

12          But my point goes to the question of was it

13  contemplated in the contract that we would have some kind of

14  relief other than the notice issues?  And the answer clearly,

15  expressly is yes.  Otherwise, that clause in section 22

16  allowing us to seek preliminary injunctive relief doesn't have

17  any meaning.  The purpose of it was to deal with this imbalance

18  of power, of market power, and to ensure that we don't have a

19  situation where BP is able to use procedural leverage to force

20  a settlement as opposed to allowing a proper and full

21  litigation on the merits.

22          Again, that's why the court in *Blumenthal* said it is

23  really the job of the district court under the FAA to ensure

24  that it is not a formality and to keep a status quo situation

25  in place until a decision can be reach.  And that is echoed in

1    other Second Circuit cases where there is a specific focus on

2    what happens where you have an exclusive supply in

3    relationship, as we have here.  We cited the *Reuters* case

4    where, in that case, it wasn't even a unique product, but it

5    was a very important product where, if they didn't have the UPI

6    photographs and instead had to use the French press

7    photographs, there would be irreparable injury to good will,

8    and the Second Circuit reversed the denial of the preliminary

9    injunction and said, no, in this circumstance, given the

10   exclusive nature and important nature of the supply arrangement

11   we will have a status quo injunction until there is a

12   determination on the merits.  So each of those cases --

13   *Roso-Lino*, *Blumenthal*, and *Reuters* -- give us that ability.

            And further, if we look at the question of what kind

15   of likelihood of success do we need to show with respect to the

16   question of whether we have reasonable grounds for insecurity,

17   the case of *Citigroup v. VSG* makes plain that where, as here,

18   there is a decided difference in the hardships, where the

19   balance tips very heavily toward one side, then the question

20   is, are there serious questions going to the merits?

            THE COURT:  But you are not denying that the harm

22   needs to be imminent, are you?

            MR. SELENDY:  The harm, your Honor --

            THE COURT:  Not just irreparable, but imminent.

            MR. SELENDY:  How you define what is imminent, again,

G4s2narA

1     turns on the commercial reality.  So if your Honor were to deny

2     the preliminary injunction and allow us to go back to our

3     bases, and then 30 days from now BP says, all right, we are

4     going to suspend performance, there won't be time for us to be

5     able to get the relief to undo it, unless the court were

6     capable of turning around and entering a preliminary injunction

7     in a matter of days, because, as I said, we need that

8     continuous supply all the time.  So every six days --

9               THE COURT:  That's what TROs are for, right?  I am

10    already familiar with this case.

11              MR. SELENDY:  But, your Honor, the question for

12    resolution on preliminary injunction isn't whether we satisfy

13    the standard for a TRO.  It is whether we have shown a

14    likelihood of success on the merits, which here goes to serious

15    questions relating to the merits; irreparable harm from the

16    nonperformance, which doesn't have to occur tomorrow for us to

17    seek that today, it has to be the threat of irreparable harm

18    when that occurs; and it relates to the balance of hardships

19    and the public good.

20              THE COURT:  Right it can't be remote, it can't be

21    speculative --

22              MR. SELENDY:  And it's not remote, your Honor.

23              THE COURT:  It's got to be actual and it's got to be

24    imminent.

25              MR. SELENDY:  So the question of the remoteness to me

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  is perhaps the easiest question for your Honor, because we

2  already have hundreds of millions of claims against each other

3  in arbitration.  This is not a situation where the parties are

4  accommodating each other and things are working and it is

5  business as usual with some speculative concern of

6  nonperformance.  Instead, we already have $160 million of

7  claims against BP related to their performance.

8        The narrow question of suspension of performance

9  altogether is not before the panel -- that's before you -- with

10 respect to the preliminary injunction request.  But that issue

11 and all of the problems are already documented.  This is not an

12 idle issue.

13       And, frankly, if you flip it the other way, what is

14 the reason for BP's objection to a notice requirement?  What

15 are they trying to protect?  They have already said, We are

16 going to perform, we intend to perform and, we are performing,

17 right?  So there is no new obligation with respect to

18 performance.  They object to telling us 30 days before they

19 suspend, and what is that?  They are basically trying to keep

20 the optionality of that leverage over us to be able to say, We

21 can put you out of business because we won't agree to that

22 30-day notice period.  It is about as minimal --

23       THE COURT:  That's not in the contract.

24       MR. SELENDY:  But, your Honor, it is a lesser form of

25 relief than a status quo injunction which, as the Second

1  Circuit said, is not cognizable as a burden to a defendant

2  where you are simply performing under the contract.

3          THE COURT:  But, again, for any relief here at this

4  preliminary stage, you have got to show that there is going to

5  be irreparable harm and that it is imminent, right?  And

6  that's, as I said, what I want to focus on.

7          MR. SELENDY:  Right.

8          THE COURT:  Let me ask you a couple of questions.

9          MR. SELENDY:  If I could just stick on that point?

10          THE COURT:  Go ahead.

11          MR. SELENDY:  I don't think there is anything that is

12  controverted as to the irreparable harm if they suspend

13  performance.

14          THE COURT:  Let's assume is that --

15          MR. SELENDY:  So the question is not whether there is

16  irreparable harm.  That is uncontroverted.  The question is,

17  have we shown that there is a likelihood of success or, under

18  the Second Circuit guidance in *Citigroup v. VSG*, whether there

19  are serious questions going to the merits of our insecurity as

20  to their performance.  That's the question.  Irreparable harm

21  is uncontroverted on the record before you.  So it is only a

22  matter of are there serious questions as to whether they will

23  suspend performance.  We submit that, when they have filed an

24  arbitration seeking $100 million in damages, when they have

25  refused to stipulate even to give us advance notice --

G4s2narA

THE COURT:  There is a big difference between litigating, as you are entitled to do, under an agreement and failing to comply with the obligations of that agreement, isn't that right?  You are litigating as well.

MR. SELENDY:  Correct, and the litigation includes our allegations of failures of performance by BP as to the provision of crude.

THE COURT:  And you are seeking termination.

MR. SELENDY:  We are seeking actually at this point that we resolve the claims on the merits and we have an orderly transition as of the end of the contract period.  At this point that is the relief that we wish to have.  All right?

THE COURT:  Let me just go through some factual questions.

MR. SELENDY:  Yes.

THE COURT:  One of my questions is why threats made in April and August of last year suggest that BP may imminently terminate performance now in April 2016?  Doesn't their continued performance to this date essentially belie your allegations or your argument?

MR. SELENDY:  No, your Honor.  The initial demands for assurances that came from BP, coupled with a reservation of rights to suspend performance, were very troubling to the refinery, but the refinery thought it could work through those issues with BP, and it struggled very hard to do so.

G4s2narA

1          That began in April.  In August there was a repetition

2     of the same kind of demands and a reservation of rights to

3     suspend performance.  And in August there was some escalation

4     where Mr. Lantero threatened not to take off the finished

5     products, something that was later recanted.

6          Then, as we moved forward in time, again there was an

7     effort to resolve things.  The parties, frankly, were engaged

8     in settlement talks, and we started to see further issues.  We

9     had the pretextual *force majeure* notice saying that a shipment

10    of crude couldn't arrive because of fog down in Houston, where

11    logistically --

12         THE COURT:  There are factual questions as to whether

13    that was bad faith or not.

14         MR. SELENDY:  Well, they disagree with us; but, as a

15    point of fact, it is impossible that the fog was the reason for

16    the delay.  We are happy to document that if that is necessary.

17         But what I want to get to is that there was a gradual

18    escalation.  So we had the statement that they couldn't deliver

19    crude in time; they introduced new testing requirements

20    basically threatening not to take the crude, the refined

21    products off away from the refinery; and then they filed claims

22    in arbitration where, as we argued to the panel, fully half of

23    their claims are based on a duty that doesn't exist, this

24    alleged duty to optimize RV.  There is no such provision in the

25    contract.  You have the contract before you.  BP has been

1  unable to point to it.  What there is is a duty for BP to

2  optimize the economics to the refinery, but there is no duty

3  for the refinery to deal with this relative value formula and

4  optimize that.  It is a pretextual claim.

5       We advanced this argument to the panel and we said,

6  given the exigencies of the case and the fact that these

7  contingent claims result in a massive overhang over the

8  refinery, we need bifurcation and expedition, and the panel

9  granted that over BP's opposition.  They granted it because

10  they were looking at what was fair to the parties.  They were

11  doing the kind of flexible, equities-driven analysis that the

12  *Citigroup* court said is part of what should happen in this kind

13  of a preliminary injunction hearing.  What is the equitable and

14  appropriate analysis that deals with the commercial realities?

15       So the question, you are comparing on the one hand,

16  the fact that BP wants to preserve the optionality of an abrupt

17  termination, because that's the only thing they would give up

18  if they have a 30-day notice requirement and, again, that

19  30-day notice requirement is a lesser remedy than simply

20  continuing performance, which the Second Circuit held is not

21  burdensome, doesn't mandate a bond and should be issued

22  specifically to preserve the parties' ability to arbitrate to a

23  final judgment.

24       THE COURT:  But, for either of the remedies you are

25  seeking, I have got to find that BP is likely to suspend its

1    performance under the contract and do so imminently, right?

2             MR. SELENDY:  You have to find that there are serious

3    questions going to that issue, your Honor, that there are

4    serious questions going to whether BP will perform properly

5    under --

6             THE COURT:  Serious questions as to whether there is

7    imminent harm or serious requests as to the merits of the

8    underlying dispute?

9             MR. SELENDY:  The fact that there will be irreparable

10   harm upon a suspension is uncontroverted in the record.  So the

11   only remaining question is, are there serious questions as to

12   whether BP will properly perform under the contract absent your

13   injunction?  And we submit that not only the arbitration

14   proceeding, but the run-up and acceleration of events until we

15   filed this case, create those serious questions and

16   insecurities for the refinery.

17            And, frankly, this is one of those instances where,

18   given the dramatic difference between the hardship for each

19   side, this ought to be a relatively easy question.  It is not

20   one where BP is going to have to undertake burdens outside the

21   contract.  Either of our formulations are consistent with the

22   contract.  We started with one that was consistent with your

23   Honor's proposed original stipulation, which is, both parties

24   continue to perform, and we remain interested in such a

25   version; and we also proposed this alternative of 30 days'

1   notice, because if you take BP at their word and they perform

2   and they intend to continue to perform, then that notice

3   obligation is never going to arise.  It only arises if they

4   change their mind and want to terminate, creating exactly the

5   issue that you are asking me about right now, is there a

6   suspension today or tomorrow, which there isn't.  There is no

7   suspension right now.

8            That's the risk we need to deal with, and we need to

9   deal with it ahead of time.  Because if we are forced to come

10  back in here on a TRO basis, keep in mind, every six days we

11  get our shipment.  It is a six-day cycle for this delivery.  We

12  have some overflow.  We can last about ten days before we need

13  to go through a shutdown process.  There is no alternative of

14  going to an alternative supplier, both under the contract and

15  because of the security liens which are wildly inflated in

16  terms of their negative effect due to those claims that were

17  filed in arbitration.

18           If you were to think about it the other way and you

19  are BP trying to exert maximum commercial pressure on the

20  refinery, it is a procedural masterstroke to make the threats

21  and then file the arbitration, create the giant liens and make

22  it impossible for us to deal with anyone else.  We have no

23  other recourse.  There is no recourse, other than to BP, which

24  is why we would like to stay in front of this court and why we

25  would like to have even the minimal relief of 30 days' notice,

1  so if there is a problem, we can come back to you and fix it

2  before that window of getting a shipment, which may take 10 to

3  40 days to arrange, before that window expires.  We need to be

4  able to come here, get it fixed, and make sure the crude

5  continues to flow.  That's for the interest of the refinery

6  itself, it is for the workers in the refinery, it is for

7  Newfoundland, as to which this is the sole source of jet fuel

8  and diesel, and it is the main source to the utility that

9  supplies 90 percent of the electric power.  There is

10  hydropower, and then there is the fuel coming from this

11  refinery.  That's why the minister in Newfoundland said it was

12  of such importance that this continues to operate, and that's

13  also why, when we come to you, we are seeking the most minimal,

14  least burdensome form of relief we can think of that would

15  satisfy those objectives and allow the arbitrators to decide:

16  Are we correct when we have asserted all of these failures of

17  performance by BP other than absolute suspension?  You know?

18  Is BP correct when they have asserted $100 million of claims

19  against us?  And can we at least go through that proceeding

20  without being procedurally driven into some kind of a

21  settlement with BP because they suspend or interrupt the

22  operations.  It is a massive cost with clear irreparable harm

23  that's uncontroverted.

24            THE COURT:  All right.  Thank you.

25            MR. SELENDY:  Thank you.

G4s2narA

1          MR. BALBER:  Good afternoon, your Honor.  Scott

2     Balber.

3          THE COURT:  Good afternoon.

4          Can I just start with you and ask you a question.  Do

5     you agree it is uncontroverted that, if BP were to suspend

6     delivery, the harm would be irreparable to NR?

7          MR. BALBER:  Most definitely not, your Honor.  I am

8     happy to explain why.

9          THE COURT:  Sure.

10          MR. BALBER:  Putting aside the obvious point your

11     honor made, which I will come back to --

12          THE COURT:  Yes, and I want you to come back to that.

13          MR. BALBER:  Putting that aside, the affidavit

14     submitted by Mr. Amin says, in paragraph 11, I believe, that

15     there are ten days of crude oil that they maintain in the

16     storage facilities at the refinery.

17          Now, the question, your Honor, is not whether NARL can

18     go negotiate a new contract, find alternative sources that will

19     last them for years to be able to refine and process and

20     resell.  The only question on irreparable harm is whether they

21     can find somebody to deliver them crude oil within ten days.

22     That is all they need to do.  The question of whether they need

23     to find an alternative long-term source is a different

24     question.  But the UCC provides explicitly for cover.  And

25     "cover" means you can go out into the market in the event of a

G4s2narA

1    wrongful termination, find someone to supply you the goods at

2    any price, and the wrongdoer, in this case if it were found to

3    be BP, has to pay the delta between the market price or the

4    contract price and what you pay in the market.  That's the

5    solution.  There is no parade of horribles with the poor people

6    of Newfoundland freezing to death.

7           The short answer is, if we were to terminate, they

8    have ten days to go out there and find a shipment of crude oil.

9    And it is simply inconceivable that, in a below-$30-per-barrel

10   oil market, they can't find someone to sell them crude oil at a

11   price for ten days.

12          So, no, your Honor, there is no irreparable harm under

13   any circumstances.

14          THE COURT:  Let's go back to imminence, which is

15   really what I wanted to focus on today.

16          MR. BALBER:  This is a classic shell game that they

17   are playing with you, your Honor.  I focus on a question you

18   asked directly and an answer that you did not get.

19          The question you asked, and I wrote it down was:  Are

20   they not performing under the contract now?  And I think, I

21   hate to interpret what your Honor meant, but I think what your

22   Honor meant was, Are they delivering crude oil?  The answer, of

23   course, is yes.

24          Mr. Selendy's response was something like, well, there

25   are ways in which BP has not performed, they have delivered

G4s2narA

1  unstable crude oils, etc.

2      What are they actually asking this court to do?  We

3  are performing under the contract.  We are delivering crude

4  oil.  It appears that they are asking the court to do more than

5  just say, Don't terminate.  But they are asking the court to be

6  kind of the day-to-day arbiter of whether we are meeting the

7  delivery specifications, whether our *force majeure* claims are

8  legitimate, whether there is really a storm in the Port of

9  Houston.

10      That's not this court's job.  That's not the mandate

11  of this court in general or in the context of a pending

12  arbitration proceeding.

13      Let me go to the two prongs that we have talked about.

14  Something Mr. Selendy said really surprised me, and I wrote

15  this down, too.  He said, All you have to determine is if there

16  is a serious question as to whether we might terminate the

17  contract.  That's not the standard for preliminary injunction,

18  your Honor.  You and I both know that.

19      The answer is, they have to demonstrate, make a clear

20  showing of both a likelihood of prevailing on the merits and,

21  as your Honor noted, actual and imminent irreparable harm.

22      Now, we haven't talked about the merits yet, and I

23  just want to get to that, because it is a really important

24  point.  Then I will get to the attenuated nature of the

25  irreparable harm in a second.

G4s2narA

1          What is the claim as to which they are saying the

2     court should find a likelihood of them prevailing on the

3     merits?  Because the claims in the arbitration, as Mr. Selendy

4     noted, are whether they have properly optimized the economic

5     efficiency of the refinery and whether we have optimized the

6     economic efficiency of the refinery.  That's a dispute before

7     the arbitrators.

8          What has not been asserted before the arbitrators or

9     anywhere else is that we terminated the contract.  Because we

10     didn't.

11          And what's not before the arbitrators or anywhere else

12     is whether we engaged in anticipatory breach of the contract.

13     Because we didn't.  And if we did, under the arbitration

14     provision in the contract, that should be before them.

15          So the likelihood of the merits standard that they

16     want you to find is not a claim that's actually been asserted

17     anywhere.  It is coming out of nowhere.

18          Now let's look at that anticipatory repudiation

19     question that they have raised.  The case law on this is just

20     crystal clear and the UCC is crystal clear.

21          Here is what the UCC says, UCC Section 611(2), about

22     retraction of a repudiation.  Let's assume they are right and

23     that the letters your Honor alluded to in August and April and

24     December are actual anticipatory breaches, we actually say in

25     those letters, We don't intend to perform.  Now, you can read

1    the letters as well as I do, and they don't say that.  But

2    let's assume they did.

3            Retraction of Repudiation, UCC section 611.2.

4    "Retraction may be by any method which clearly indicates to the

5    aggrieved party that the repudiating party intends to perform."

6            And what do we have in support of that?  We have

7    Mr. Lantero's affidavit submitted in opposition to the

8    preliminary injunction, paragraph 4, in which he says, "I

9    represent that BP continues to perform its obligation under the

10   Crude PSA and intends to continue to perform the obligations

11   under the Crude PSA despite the current dispute between the

12   parties."

13           And what do the cases say?  Leibowitz v. Elsevier,

14   which is 927 F.Supp. 688, a Southern District case, "A

15   repudiation which is followed by continued performance cannot

16   be treated as an anticipatory breach since continued

17   performance amounts to a retraction of any repudiation.

18   *Argonaut v. Sidek*, 1996 WL 617335, another Southern District

19   case.  "For a statement to constitute anticipatory breach, the

20   announcement of an intention not to perform must be positive

21   and unequivocal."  That all assumes that the letters that your

22   Honor has even constituted an anticipatory breach in the first

23   place.

24           But what have we done since?  We have performed for a

25   year.  We have a declaration, under oath, submitted to this

G4s2narA

1    court, that we continue to intend to perform.  That's it.  They

2    are done.  There is no anticipatory repudiation claim and,

3    therefore, there is no issue for a preliminary injunction.

4            The last point on merits, your Honor.  Where is the

5    case or controversy that gives this court subject-matter

6    jurisdiction?  They are saying you need to perform under the

7    contract.  What we are doing is performing under the contract.

8    Where is the fire?  And for that proposition, your Honor, there

9    is a case that I want to quote, Northern District of Illinois

10   case, but I think it is right on point, *Chicago and Northwest*

11   *Transportation Company v. Soo Line Railroad Company,* 739

12   F.Supp. 447.  It says, "Article III of the Constitution limits

13   a district court's jurisdiction to those complaints that allege

14   an actual case or controversy.  To satisfy the case or

15   controversy requirement, a plaintiff must allege that he has

16   sustained or is immediately in danger of sustaining some direct

17   injury.  Abstract injury is not enough.  The threat of injury

18   must both be real and immediate, not conjectural or

19   hypothetical.  Where a plaintiff's claim is based on some

20   future injury, the court must pay particular attention to the

21   likelihood that the harm alleged ever will come to pass.  A

22   case is not ripe for review if the injury to plaintiff is based

23   on future events which are not likely to occur as anticipated

24   or may not even occur at all."

25           That is not even an irreparable harm question, your

1  Honor.  It's a subject-matter jurisdiction question.  There is

2  no subject-matter jurisdiction if there is no case or

3  controversy, and there is no case or controversy when the harm

4  that they are concerned about may not occur.

5          Let me move now, if I may, to irreparable harm.  As

6  your Honor pointed out, the critical question here -- and we

7  disagree whether there is irreparable harm under any

8  circumstances, but the critical question is actual and

9  imminent.  And let's look at the chronology.  Putting aside the

10  letters that were sent last April of 2015, August 2015,

11  December 2015, they filed their preliminary injunction

12  application on January 20, 2016.  No TRO, preliminary

13  injunction.

14          What have we done since then?  We have continued to

15  deliver crude oil every day we are supposed to.  We have

16  complied with the contract in every manner we are supposed to.

17          Now, they claimed on January 20, 2016, imminent,

18  direct, actual harm.  The people of Newfoundland are going to

19  freeze to death if your Honor doesn't issue a preliminary

20  injunction.  That's what Mr. Burchfield said.  We don't see him

21  anymore, but the principle is still there.

22          What's happened since?  Well, your Honor had scheduled

23  oral argument that we have here today for March 14, five weeks

24  ago, almost six weeks ago.  This was of such great, imminent,

25  actual, significant, irreparable harm that Mr. Selendy had

G4s2narA

1   another obligation, couldn't make it, and no one from the

2   700-lawyer law firm of Quinn Emanuel could make it either.

3        So we wrote to you and said, you know what, Judge,

4   this must be really serious business for the people of

5   Newfoundland.  We are available the week of March 21.

6   Mr. Selendy and the 700-lawyer law firm of Quinn Emanuel

7   couldn't send anybody that week either.

8        April 1, 2016, the arbitration panel is constituted.

9   They are there.  They are working.  They are getting paid by

10  the hour to consider the issues in this case.  The harm was so

11  imminent, so irreparable, so actionable, they didn't ask the

12  panel for relief.

13       A conference with the panel was held a week or so

14  after that.  They opposed having the panel consider the issue.

15       Now, yes, this court does have jurisdiction under

16  paragraph 23 of the contract to hear it, but if this is so

17  actual, if this is so imminent, if this is so irreparable, why

18  didn't they ask somebody else to do it on April 1 or April 10?

19       So now we are here on April 25, and it is no more

20  actual, no more imminent, and no more irreparable than it was

21  last April or August or December or January or March or April

22  1.

23       Thank you, your Honor.

24       THE COURT:  Would you like to respond?

25       MR. SELENDY:  I would, your Honor, on a few points.

1          I will begin perhaps by saying this is not a joke.

2     The idea that we have heard from Mr. Balber that the concern is

3     that people will freeze to death is not the premise here.  The

4     premise is that irreparable harm, as is construed by every case

5     in the Second Circuit, includes the destruction of a business,

6     people losing their jobs and, frankly, the broader risk to the

7     public good which was reflected by the Minister of the

8     Department of Natural Resources there.

9          You know, it is going to be too late if we wait until

10    they actually terminate or suspend performance, and that isn't

11    the standard.  The whole point of a status quo injunction is to

12    try and ensure a continued operations during the pendency of a

13    resolution of the dispute between the parties.  That's what

14    the --

15         THE COURT:  How ripe is it from your perspective?  You

16    have ten days essentially, right --

17         MR. SELENDY:  That's correct.

18         THE COURT:  -- to get the oil from a different source.

19         MR. SELENDY:  Well, no.  Okay.  And I am glad you

20    raise that, because what we just heard from Mr. Balber is

21    completely wrong.  It is counter to the reality of the

22    operations and it is totally unsupported by the record.  What

23    the record shows, including the contracts which BP has, is that

24    the refinery is not able to negotiate with any alternative

25    supplier.  The idea that we could go out after a suspension or

1    termination and source oil from somewhere else presupposes that

2    there is no financing issue, that there are no security liens

3    that BP has in place, that we can overcome what is typically a

4    10- to 40-day window to source alternative oil.  But nobody is

5    going to ship oil to that refinery while BP has hundreds of

6    millions in securities liens that take first place on plant,

7    property, and equipment.  The reality here -- and that's what

8    your Honor should address -- the actual commercial reality is

9    that there is no alternative.  If BP does not deliver and if

10   its arbitration claims are still pending, if its arbitration

11   claims have not been resolved, which is why we seek early

12   resolution, which they opposed, then we cannot source from

13   anybody else, and there is no controverting that.

14        THE COURT:  Let's put aside the other source, right?

15   So the ten days, if you were to come to court, either here or

16   to the arbitrator --

17        MR. SELENDY:  Again --

18        THE COURT:  -- and request emergency relief to force

19   BP to comply with the contract, tell me why that would not give

20   you enough time.

21        MR. SELENDY:  I would like to first address the

22   suggestion that we chose not to advance this issue in front of

23   the arbitrators.  We had filed this complaint before the

24   tribunal was constituted.  Your Honor said you were fully aware

25   of the issues before that tribunal was constituted.  BP opposed

G4s2narA

any type of expedited proceedings except on a trivial

differential issue.  They oppose any type of expedition.  And

we felt very strongly that since we had the hearing scheduled

before your Honor and, frankly, we would have been glad to be

here earlier if we could have been, since we had it scheduled,

we should proceed before you, as the contract expressly

contemplated we would have a right to do.

But coming back to your question why is ten days not

sufficient, every six days we get a shipment of about 600,000

barrels of oil.  That's what's necessary on average for this

refinery to keep running.  Those shipments are the process of

an extended negotiation and confirmation mission and nomination

of different times of crudes.  They come from Denmark, from

West Africa, from Texas.  The shipping times range from 10 to

40 days.  It is a long process to keep that thing running.  If

BP stops, it is just false -- contrary to what you heard from

BP, it is just false that we could go out and replace that, as

if this were a box of widgets that we could buy in five

different places.  It doesn't work that way.

THE COURT:  Going back to the timing and putting

aside, because it seems like there is a factual dispute as to

the other source --

MR. SELENDY:  I don't think there is a dispute,

because there is nothing in the record that supports what you

just heard.

G4s2narA

          1          THE COURT:  There is a dispute between your arguments,

          2    between counsel, okay, so let's just leave it at that.  But you

          3    have indicated that you have ten days of reserves, right?

          4          MR. SELENDY:  We have ten days of stock, that's

          5    correct.  That's what is believed to be the amount necessary in

          6    order to maintain the ongoing supplies.

          7          THE COURT:  So you can proceed --

          8          MR. SELENDY:  So but let's be clear about it then.  If

          9    we have the suspension of performance and we were to be forced

         10    to seek a TRO instead of a PI, right, which has different

         11    standards, but if that's the standard under which you are

         12    judging our preliminary injunction motion --

         13          THE COURT:  No, I am judging the preliminary

         14    injunction motion under the PI standard.  That's what I intend

         15    to do today.

         16          MR. SELENDY:  Well, so then let's be clear, then.  The

         17    harm is going to be immediate.  As soon as they tell us or as

         18    soon as, through their actions, they say we don't have the

         19    crude for you.  That harm is immediate.

         20          THE COURT:  That hasn't happened yet.

         21          MR. SELENDY:  Well, what has happened in the first

         22    force majeure notice where they told us falsely that they could

         23    not bring us the crude oil on time, when we confronted them and

         24    said, Logistically your explanation doesn't make any sense,

         25    they then found oil and brought it to us, and only after that

1    confrontation.

2         Then, during the period that we have had this before

3    your Honor, we have not had a repetition of that, although we

4    have had instances, again, in that period running up to this

5    where they tested product, and even after it satisfied all of

6    the specifications, they ran additional tests as a condition of

7    offloading it.  Either one creates the same problem for us.

8         So the question is, can we operate practically without

9    having some kind of assurance that BP in fact will continue to

10   perform?

11        Under the UCC itself, which is not the only measure

12   here, but is a relevant measure, under Section 2-601(2), the

13   adequacy of any assurance shall be determined according to

14   commercial standards.  It is the commercial reality that

15   determines whether it is adequate.  In other words, it is not

16   sufficient in this context for BP to stand up and say, oh, yes,

17   we are going to perform when, at the same time, they have

18   failed to articulate any justification as to why they can't

19   agree to just give us 30 days' notice if they want to change

20   their mind.  That wasn't addressed at all by my colleague.  Not

21   for a moment did you hear any justification as to the

22   tremendous burden that would create for BP, any hardship.  So

23   what you have right now is our showing of hardship to the

24   refinery and no showing of hardship to BP.  And you have to

25   ask, we submit, how can they at the same time say we should not

1    have any concern because we are going to continue to perform

2    and yet they refuse to agree to give us even 30 days' notice if

3    they change their mind so there can be an orderly transition,

4    taking into account not just what we have to do with this

5    court, but also what we have to do commercially to try and

6    manage the disruption from a suspension of the delivery?

7           This is really a situation where the flow of crude is

8    continuous.  It is every six days that a tanker comes.  It is

9    36 hours to get that unloading done.  It is like an accordion.

10   It is almost a continuous supply.  It replaces a pipeline.  If

11   you turn that off, that creates problems immediately.  And

12   there is no reason why we should wait until there is actually

13   that suspension before we come in, because you have heard no

14   justification as to why BP won't agree to simply give us that

15   notice.

16          THE COURT:  But there is a difference between asking

17   them to rewrite the contract in a way, perhaps, it would have

18   been in your client's interest to do initially and meet the

19   standard of a preliminary injunction.

20          MR. SELENDY:  Well, we submit that the imminence of

21   harm has to be gauged by what is the nature of the harm, the

22   irreparable harm.  We submit there are serious questions as to

23   the risk of suspension of performance, which is all that is

24   required under controlling Second Circuit law; and that the

25   irreparable harm we have laid out is uncontroverted; that the

1    argument that you heard today that we could source from another

2    supplier is wholly unsupported and, in fact, contradicted by

3    the factual record and therefore should be given no credence;

4    and, therefore, under the proper understanding of what is

5    imminent harm, we have established that; and, further, that

6    every holding by the Second Circuit and by other courts,

7    including, for example, in the *Eastman Kodak* case, where the

8    issue was the ink supplier's decision not to keep on supplying

9    and there is, again, an injunction to keep on supplying until

10   the dispute was done, and every one of those instances you

11   could construe the status quo injunction as rewriting the

12   contract in the sense that it compels the party to continue

13   performing under the terms of the contract even though that

14   party is claiming some basis to stop performing.  Right?  In

15   every one of those cases, there is on the part of the entity,

16   the supplier, there is an argument that, under the contract, we

17   are entitled to stop supplying and when the court says, no, I

18   am going to require you to keep performing until there is a

19   full adjudication on the merits, that is arguably a

20   modification.  But that's more of a modification than what we

21   see here with just a 30-day notice.

22          THE COURT:  Let me ask you a question.  You have said

23   I think a number of times that if there are serious questions

24   that go to whether there is going to be irreparable harm,

25   that's sufficient.

G4s2narA

1          MR. SELENDY:  No.

2          THE COURT:  Is it no?

3          MR. SELENDY:  Yes.

4          THE COURT:  Because it is part of the standard --

5          MR. SELENDY:  I don't --

6          THE COURT:  No, no.  Let me just finish the question.

7          The standard for preliminary injunction, I think, is

8     well established.  A party seeking an injunction must show that

9     it is likely to suffer irreparable harm absent injunctive

10    relief and either likelihood of success on the merits of its

11    case or sufficiently serious questions going to the merits --

12         MR. SELENDY:  Right.

13         THE COURT:  -- to make them fair ground for

14    litigation.  And then you must also show that the balance of

15    hardships tips decidedly in your favor.

16         Do you agree that that's the standard.

17         MR. SELENDY:  Yes, we do, your Honor.  I thought you

18    were asking me whether the serious question goes to the

19    irreparable harm as opposed to the likelihood of success on the

20    merits.

21         THE COURT:  No.  It goes to the merits, am I right?

22         MR. SELENDY:  We agree.

23         THE COURT:  All right.

24         Is there anything else?

25         MR. SELENDY:  That's it, your Honor, unless I can

G4s2narA

1    help.

2              THE COURT:  Yes.

3              MR. BALBER:  Two quick points for me, your Honor.

4         I will address very briefly this 30 days' notice

5    point, which I think your Honor gets it.  There is all kinds of

6    things in the contract I don't like either and, as you know and

7    as I know, as we all know, the contract was negotiated by

8    sophisticated parties.  There is a carefully drafted

9    termination and notice provision, and that's it.  That's what

10   they bargained for, that's what they get.

11             And coming to my second point, which arises from that,

12   this is actually worse than I thought.  Because what NARL is

13   actually asking for is not just notice that we will give

14   written termination or an injunction preventing us from

15   terminating.  They want you to police *force majeure* events.

16   That's what Mr. Selendy just said.  He just said that we enter

17   into a *force majeure* event and it was a subterfuge -- that's my

18   word, not his word -- and that it was actually termination and

19   we are going to keep doing that unless the court issues an

20   injunction.  I don't think this court wants to be in the

21   position -- correct me if I am wrong -- of evaluating whether

22   the crude oil that we are delivering meets specifications,

23   whether it is late because of a storm in the Port of Houston,

24   or something else.  Because what they are going to do is they

25   are going to take the injunction and they are going to say,

G4s2narA

1    ah-ha, *force majeure*, they are claiming a flood or a fire or a

2    storm.  Now, Judge, they have actually terminated, and you can

3    hold them in contempt.  That is why this is so invidious and so

4    dangerous, especially in light of the fact that there is

5    absolutely no imminency to any of it.

6         Mr. Selendy used the word "if" at least 14 times in

7    his last statement to your Honor.  If BP terminates and if we

8    can't do this and if we can't do that, this parade of horribles

9    is going to come to fruition.  But "if" is not enough to give

10   rise to the court's jurisdiction to issue a preliminary

11   injunction.

12        And you are right.  If circumstances changed and if we

13   said, you know what, we are terminating, this court is open for

14   business five days a week.  I will be down here, Mr. Selendy is

15   going to be down here, and you will have a very tough

16   conversation with me about having to do this again when I stood

17   in front of you with an affidavit of Mr. Lantero saying, We

18   have every intent to perform.

19        Thank you, Judge.

20        MR. SELENDY:  May I, your Honor, very briefly?

21        THE COURT:  Last word, briefly.

22        MR. SELENDY:  Last thing I wanted to point out, you

23   heard from BP's counsel about a case in the Northern District

24   of Illinois.  You heard nothing about the controlling Second

25   Circuit authorities that relate to the grant of a status quo

G4s2narA

1    injunction, which is all we seek.

2        The issues that he just raised will be issues for the

3    arbitration.  We have no intention of coming here to litigate

4    day-to-day events.  We have the arbitration panel for that, and

5    that's what we would like to ensure, that we have the time and

6    the ability for the arbitrators to hear and resolve those

7    matters without a forced hand from a suspension where, as a

8    practical matter, we face all kinds of risks upon a suspension

9    of performance, and we can't deal with that effectively through

10   a TRO process.  Thank you.

11       MR. BALBER:  Like the presidential debates, since he

12   referred to me, can I give one response?

13       THE COURT:  All right, but you have 30 seconds.

14       MR. BALBER:  The Second Circuit cases are very clear,

15   your Honor.  You actually alluded to it.  They involve

16   circumstances where there is an actual termination of the

17   contract, and the injunction is to preserve the status quo so

18   the termination does not take effect.  That is not this case,

19   Judge.

20       THE COURT:  Why don't we take a very short break, just

21   a couple of minutes and I will come back and rule.

22       MR. BALBER:  Thank you, Judge.

23       (Recess)

24       THE COURT:  I am going to deny NR's motion for a

25   preliminary injunction.  My decision is based on the

1  plaintiff's failure to show the likelihood of imminent harm.

2         To satisfy the irreparable harm requirement, plaintiff

3  must demonstrate that, absent a preliminary injunction, it will

4  suffer an injury that is neither remote nor speculative, but

5  actual and imminent, and one that cannot be remedied if a court

6  waits until the end of trial to resolve the harm.

7         In assessing the possibility of irreparable harm

8  courts must not adopt a categorical or general rule or presume

9  that the plaintiff will suffer such harm, but instead must

10  actually consider the injury the plaintiff will suffer if he or

11  she loses on the preliminary injunction but ultimately prevails

12  on the merits, paying particular attention to whether the

13  remedies available at law, such as monetary damages, are

14  inadequate to compensate for that injury, and I am looking at

15  the *Kraft Foods* case from 2011.

16         It's axiomatic that because a preliminary injunction

17  is an extraordinary and drastic remedy, it should only be

18  granted where there is a concrete threat that a party's

19  conduct, if not enjoined, will frustrate the arbiter's ability

20  to do justice at the conclusion of the arbitration.  *See In Re:*

21  *MB International WWL*, 2012 WL 3195761 at *12.

22         NR points to alleged threats made by BP and disputes

23  with BP as evidence that BP will not continue to perform under

24  the Crude PSA.  These do not, in my view, establish that BP

25  plans to imminently discontinue its perform under the contract.

1   To the contrary, BP has indicated in its declaration

2   that it intends to continue performance. NR, for example,

3   argues that BP made explicit threats that it would suspend its

4   supply of crude oil or cease loading of the finished products

5   on its shipping vessels.

6   With respect to two of those purported threats, which

7   were in the draft April 23, 2015, letter and the August 10,

8   2015, letter from BP to NR, I agree with BP that BP made not

9   threats but, rather, merely reserved its legal rights. In the

10  August 10 letter, for example, it states that, "While BP wishes

11  to work together with NARL to mitigate BP's ongoing damages, it

12  reserves the right to suspend performance under the agreement

13  pending receipt of assurance, to the extent permitted by UCC

14  Section 2-609." The letter concludes with the statement "BP

15  will continue to work with NARL on all outstanding issues, but

16  we need assurance that the information referenced above will be

17  provided." See Exhibit B to the Amin declaration.

18  BP's April 23, 2015, draft letter, which includes

19  similar reservation of rights, also states that "BP continues

20  to have a strong desire to work with NARL to amicably resolve

21  the current situation." See Exhibit A to the Amin declaration.

22  NR also alleges that Mr. Lantero, VP of BP Products

23  North America, threatened Mr. Amin, the president of NR on

24  August 15 by phone. According to Mr. Amin's declaration,

25  Mr. Lantero threatened that BP would delay or even refuse to

G4s2narA

load the finished products that BP had purchased from NR.  See

paragraph 25 of the Amin declaration.

Mr. Lantero, however, denies this allegation and

states in his own declaration that he has never threatened to

terminate or suspend performance.  See his declaration at 3.

Even if I were to resolve this factual dispute in NR's

favor and assume that Mr. Lantero made the alleged threat, I do

not find that this threat provides sufficient evidence that BP

will imminently suspend performance, especially in light of

BP's continued performance from August through the current

date.

NR also argues that BP's two notices of *force majeure*

made on December 29, 2015, and January 12, 2016, and BP's

January 14, 2016, request to retest certain refined product

were made in bad faith and therefore raises concerns about

whether BP will continue to perform.  The Amin declaration at

30-33.  Specifically, NR argues that the timing and

circumstances of these events -- taking place shortly after BP

filed its December 21, 2015, demand for arbitration -- evidence

that BP sought to gain unwarranted concessions from NR.

BP denies this allegation, contending that the *force*

*majeure* notices and the request for retesting were made in good

faith.  That's the Lantero declaration, 21 to 25.

There is insufficient evidence in the record before me

to support NR's claim that BP acted in bad faith.  NR only

1    offers circumstantial evidence of this.

2         In any event, NR does not offer any evidence that

3    these events, even when taken together, establish that BP plans

4    to suspend performance at all, let alone immediately.  Indeed,

5    Mr. Lantero represents, in sworn declaration, that BP continues

6    to perform its obligations under the Crude PSA and intends to

7    continue to so, despite the current dispute between the

8    parties.  See the Lantero declaration at 4.

9         Ultimately this lack of imminent harm distinguishes

10   this case from those on which NR relies.  In *Guinness-Harp,*

11   *Roso-Lino Beverage Distributors*, and *Reuters Limited*, each of

12   the defendants had notified the respective plaintiffs

13   specifically that they intended to terminate performance, and

14   we talked about this during plaintiff's argument.  The

15   plaintiffs thus sought and were granted injunctions compelling

16   the defendants to continue to perform during the pendency of

17   the proceedings.  Here, by contrast, BP has made no statement

18   that it intends to terminate the Crude PSA; to the contrary.

19        NR argues that BP's alleged failure to give adequate

20   assurances is tantamount to termination.  I disagree.  BP's

21   alleged failure to do so does not frustrate the arbitration

22   panel's ability to do justice at the conclusion of those

23   proceedings, as termination would.  Instead, this is a dispute

24   that the panel is in a position to decide at the arbitration's

25   conclusion.

G4s2narA

1          Critically, NR does not point to a single case in

2     which a failure to give adequate assurances was held to be

3     grounds for an injunction to issue.

4          In their reply, NR also requests, in the alternative,

5     more limited relief in the form of an order requiring BP to

6     provide 30 days' notice if they intend to terminate.  I agree

7     with BP, however, that this request, as we also discussed

8     during argument, while framed as more limited relief, is in

9     fact an attempt to rewrite the agreement between the parties.

10    The Crude PSA does not require such advance notice of

11    termination; therefore, the court will not impose such a

12    requirement.  See the Second Circuit's opinion in *Met Life*

13    *Insurance Company*, 906 F.2d at 889-90.

14         Before we adjourn, I want to be clear that I have not

15    reached whether NR is likely to succeed on the merits or

16    whether, in the event that BP does terminate, the harm would be

17    irreparable.  Because I find that NR has not shown that the

18    harms attending termination are imminent, I do not have

19    occasion to reach those questions.  Therefore, in the event

20    that NR believes that BP does wrongfully suspend or terminate

21    performance, my opinion should not be read to foreclose them

22    from seeking interim relief whether with the district court or

23    the arbitration panel.

24         So that's my ruling.

25         In light of that, is it proper to close this case?  Is

G4s2narA

1    there any additional relief that the plaintiff is seeking

2    longer term in this action?

3            MR. SELENDY:  Your Honor, we would request that the

4    court retain jurisdiction of the case until the conclusion of

5    the pending arbitration proceedings.  In the event that BP

6    changes its mind and does in fact abruptly terminate, if it is

7    the option that it has been left open, we would like to be able

8    to come back before your Honor and present it to a fully

9    knowledgeable fact-finder.  Obviously we also have the

10   tribunal, and we will certainly raise any issues before the

11   tribunal, but we don't know, frankly, what will be the fastest

12   way to seek relief in the event of such an occurrence.  So for

13   that reason we would request that, notwithstanding your ruling,

14   that you stay proceedings until such time as the arbitration is

15   concluded or until there is occasion to seek an application for

16   a TRO.

17           THE COURT:  Mr. Balber, do you have an opinion on

18   that?

19           MR. BALBER:  Yes, your Honor.  I would suggest, as an

20   alternative, your Honor, that the case be dismissed with leave

21   to refile.  I don't see any value in keeping the case pending,

22   and I would also stipulate that we won't oppose reassignment to

23   your Honor in the event they need to refile the case.  But I

24   don't think it serves anybody's best interest to have a stayed

25   case out here when there is no ultimate relief that is going to

G4s2narA

1   be sought absent a change in circumstances.

2           MR. SELENDY:  If I may, if there is a termination or

3   suspension, every single day will matter to us.  The time

4   frame, as I mentioned at the outset, is the critical factor for

5   us.  That's why we respectfully disagree with your Honor on how

6   imminence is to be assessed.  But every single day will matter,

7   and I think it would make a material difference if the

8   proceeding were stayed until such time as the arbitration

9   matter is concluded.  Hopefully we do not need to come back

10  before you.  Hopefully BP retains its current intent to

11  perform; but, if that changes, every day will make a difference

12  to us.

13          THE COURT:  All right.  Is the hands up an okay?

14          MR. BALBER:  The hands up is I don't really care.

15  What I was going to suggest is that if it shortens the time for

16  Mr. Selendy, I am willing to have him serve me by e-mail but --

17          THE COURT:  The timing of the arbitration is what, end

18  of August, is that right?

19          MR. SELENDY:  We have, in fact, given the way in which

20  the expedition and bifurcation was determined, we now have two

21  early hearings, as we requested, on BP's two highest forward

22  claims.  The first hearing is July 25.  If the panel determines

23  there is a need to hear argument or witnesses on that, that's

24  the legally dispositive motions as to whether or not NR has a

25  duty to optimize.  The second hearing is August 30 to 31 on the

G4s2narA

1    gas's accounting claims, but there is the expectation of a

2    further set of hearings on all of the residual claims once

3    those two are determined.

4              THE COURT:  Why don't I keep it open for now.

5              MR. SELENDY:  Thank you.

6              THE COURT:  I just ask you to keep me posted on the

7    status of the arbitration; and, in any event, no later than

8    August 31 of this year, write me a status letter.

9              MR. SELENDY:  Thank you.

10             THE COURT:  Then if the case, for some reason, there

11   is a need to keep it open beyond that, I will revisit that

12   decision at that time, okay?

13             MR. SELENDY:  Thank you.

14             MR. BALBER:  Open but stayed, obviously.

15             THE COURT:  It is opened but stayed, and the motion is

16   denied.

17             Okay.  Thanks.  Have a good afternoon.

18                              - - -

19

20

21

22

23

24

25